Carroll HUBBARD, Jr., Petitioner,

v.

KENTUCKY BAR ASSOCIATION,
Respondent.

No. 2000–SC–0046–KB.

Supreme Court of Kentucky.

Oct. 25, 2001.

## OPINION AND ORDER GRANTING REINSTATEMENT

LAMBERT, Chief Justice.

This matter comes to us on an application for reinstatement by Carroll Hubbard pursuant to SCR 3.510.

Hubbard resigned under terms of disbarment on June 23, 1994, after having been convicted of three felonies: one count of conspiracy to impede and impair the Federal Election Commission, in violation of 18 U.S.C. § 371, one count of theft of government property, in violation of 18 U.S.C. § 641, and one count of obstruction of justice in violation of 18 U.S.C. § 1503, *Hubbard v. Kentucky Bar Association,* Ky., 878 S.W.2d 13 (1994). This criminal

conduct, as established by the convictions, violated SCR 3.130–8.3.

Hubbard's convictions stem from a conspiracy between Hubbard and others to transfer funds from his 1992 Congressional campaign committee, which he established for his re-election race in Western Kentucky, to his then-wife's 1992 Congressional campaign committee, which was established for her Congressional race in Eastern Kentucky. Hubbard also used his Washington D.C. Congressional staff to work on his wife's campaign. The staff members used aliases and were being paid by the federal government for the time that they spent campaigning for her in Eastern Kentucky. Hubbard admitted that the purpose of this conspiracy was to solidify support for him across the state of Kentucky in his quest to run for governor.

Hubbard was sentenced to a federal prison for 36 months on each conviction with the sentences to run concurrently. He was also ordered to pay restitution. He served two years and twenty days in prison, five months in a halfway house in Paducah, Kentucky, and one month of home incarceration in Mayfield, Kentucky.

Hubbard applied for reinstatement on January 13, 2000. Pursuant to SCR 3.510(4), his application was referred to the Character & Fitness Committee ("Committee"), and a full investigation followed in accordance with SCR 2.040. On October 19, 2000, following conclusion of the investigation, the Committee held a formal hearing pursuant to SCR 2.050. The Committee focused on three issues during the hearing:

(1) Has Mr. Hubbard shown by clear and convincing evidence that he has complied with every term of the Order of Suspension or Disbarment?;

(2) Has Mr. Hubbard presented clear and convincing evidence that he possesses sufficient professional capabilities to serve the public as a lawyer?;

(3) Has Mr. Hubbard shown by clear and convincing evidence that he is of good and moral character?

On January 2, 2001, the Character and Fitness Committee issued its report, finding that Hubbard had proven in the affirmative all three issues, and recommending reinstatement. Among some of the evidence that the Committee based its finding was his brother's testimony that Hubbard will be a credit to the profession; his former law colleague's testimony that Hubbard was meticulous (as a lawyer) almost to a fault, and that he had great follow-up as far as clients were concerned; his long time friend, colleague, and former campaign manager's testimony that, "[h]e is very remorseful, regretted what has occurred and was contrite, and he's very sincere. Events that occurred were out of character for Carroll Hubbard." The Committee also considered the testimony of Hubbard, who testified as to his familiarities with domestic relations, title work, personal injury, and worker's compensation issues. Hubbard also acknowledged that his conduct was wrong, that he went through a lot because of his mistakes, and that what he did was devastating to his life and family.

The Committee thereafter unanimously recommended that Hubbard be reinstated. Because of the thoroughness of the report of the Character and Fitness Committee, we set forth its Findings of Fact, Conclusions of Law and Recommendation as follows:

**SUPREME COURT OF KENTUCKY**

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND RECOMMENDATION OF THE CHARACTER AND FITNESS COMMITTEE OF THE KENTUCKY OFFICE OF BAR ADMISSIONS**

IN RE: **CARROLL HUBBARD, JR.**

MAY IT PLEASE THE COURT:

## I. RELEVANT EVENTS LEADING TO DISBARMENT

Mr. Hubbard was admitted to the Kentucky bar on July 1, 1962.

On April 5, 1994, Mr. Hubbard, who was a member of the United States House of Representatives representing the First Congressional District of Kentucky, was charged with and pled guilty to one count of conspiracy to impede and impair the Federal Election Commission, a felony offense in violation of 18 U.S.C. § 371, one count of theft of government property, a felony offense in violation of 18 U.S.C. § 641, and one count of obstruction of justice, a felony offense in violation of 18 U.S.C. § 1503.

The charges arose from a scheme and conspiracy by Mr. Hubbard and others to transfer funds from the Carroll Hubbard for Congress Committee organized in support of Mr. Hubbard's candidacy for the United States House of Representatives from the First Congressional District to a committee which was organized to support the candidacy of his wife, Carol Brown Hubbard for election to the United States House of Representatives from the Fifth Congressional District of Kentucky.

The details of the charges are as follows:

1. From approximately November 1990 through May 1992, Carol Brown Hubbard, wife of Carroll Hubbard, Jr., was a candidate for election to the United States House of Representatives for the Fifth Congressional District of Kentucky.

2. From approximately January 1975 until January 1993, Carroll Hubbard, Jr., was a member of the United States House of Representatives representing the First Congressional District of Kentucky.

3. The Carol Brown Hubbard for Congress Committee (CBHCC) was the principal campaign committee authorized to support the candidacy of Carol Brown Hubbard for Congress.

4. At various times from October 1991 through May 1992, Carroll Hubbard Jr. directed and ordered employees of his Congressional office to travel to various locations outside the First Congressional District to assist Mr. Hubbard's wife, Carol Brown Hubbard, in connection with her primary election campaign for the Fifth District Congressional seat, while those employees were receiving salaries from the House of Representatives.

5. Mr. Hubbard directed and ordered his employees, who worked on his wife's campaign, to state that they were on vacation at the time they were working on the Carol Brown Hubbard campaign when, in fact, they were not on vacation.

6. In order to prevent anyone from discovering that employees of Mr. Hubbard were working on Mrs. Hubbard's campaign while receiving a salary from the House of Representatives, Mr. Hubbard suggested and directed that certain employees use aliases when working on Mrs. Hubbard's campaign.

7. At various times beginning in October 1991 and continuing through May 1992, employees of Mr. Hubbard, as well as employees of the Subcommittee on General Oversight and Investigations of the Committee on Banking, Finance and Urban Affairs of the House of Representatives, during hours when those employees were receiving a salary for and were supposed to be performing official business of the House of Representatives, engaged in campaign activities on behalf of Mrs. Hubbard. Such activities included

accompanying Mrs. Hubbard at various campaign events in the Fifth Congressional District of Kentucky, preparing written solicitations for contributions, arranging fundraising events, preparing letters acknowledging contributions, maintaining the records of the Carol Brown Hubbard for Congress Committee, and preparing reports to the Federal Election Commission on behalf of the CBHCC.

8. Beginning in October 1991 and extending through May 1992, in the District of Columbia and elsewhere, Mrs. Hubbard willfully and knowingly aided and abetted Mr. Hubbard in stealing and converting to his own use and to the use of Mrs. Hubbard, property of the United States, that is, the value of the salaries paid by the United States House of Representatives to its employees.

Mr. Hubbard was sentenced to 36 months on each offense, with the periods of incarceration to run concurrently.

On May 11, 1994, Mr. Hubbard filed a motion to resign his membership to the Kentucky bar under terms of disbarment for a period of five years. The Supréme Court granted the motion on June 23, 1994.

## II. REINSTATEMENT PROCEDURAL HISTORY

Carroll Hubbard, Jr. served two years and 20 days in three federal institutions, five months in a halfway house in Paducah, Ky., and one month home incarceration in Mayfield, Ky. His home incarceration ended July 20, 1997 and was followed by three years of probation.

Having been allowed to resign his membership to the Kentucky bar under terms of disbarment for a period of five years, by Order dated June 23, 1994, the first possible date that Mr. Hubbard could be readmitted to the Kentucky Bar was June 24, 1999. Mr. Hubbard applied for reinstatement January 13, 2000. That application for reinstatement was filed well before the end of his period of probation, which ended on or about July 20, 2000.

Mr. Hubbard's application was referred to the Character and Fitness Committee for processing, pursuant to SCR 2.040. The forms necessary for the Character and Fitness Committee to begin its investigation were returned by Mr. Hubbard February 4, 2000. The Character and Fitness Committee immediately initiated a full investigation. Upon conclusion of that investigation, copies of the final report were provided to Mr. Hubbard and Bar Counsel.

A formal hearing was requested by Mr. Hubbard on July 11, 2000 and a hearing was initially scheduled within the' sixty days required by SCR 3.505(3). Upon agreement of the parties that hearing was rescheduled for and held on October 19, 2000. As a result of the hearing Mr. Hubbard was requested to provide certain supplemental information. This Committee recommendation has been prepared in accordance with the time frames established by the parties to the hearing following receipt of the requested information.

In attendance at the hearing were the following:

The Applicant:

| | |
|---|---|
| Carroll Hubbard, Jr. | Applicant |
| Hon. James W. Owens | Attorney for Applicant |

Witnesses Called by Applicant:

| | |
|---|---|
| John C. Huffman | Baptist Minister (Retired) |
| David L. Van Horn | Attorney |
| Kyle T. Hubbard | Attorney & Brother |
| Daniel Street | First Cousin |
| Timothy A. Cantrell | Political Science Teacher |
| Vivian A. Hubbard | Wife |
| Dennis L. Null | Attorney |

Character and Fitness Committee Members Present:

| | |
|---|---|
| Hon. Grant Helman, | Chair |
| Hon. Gary D. Payne | Member |
| Hon. Karen K. Caldwell | Member |
| Hon. Woodson T. Wood | Member |

Others in attendance:

| | |
|---|---|
| Barbara Rea | Bar Counsel Kentucky Bar Association |
| Ronald M. Hayes | General Counsel Character & Fitness Committee |

(No witnesses were called by either the Kentucky Bar Association or the Character and Fitness Committee.)

## III. BURDEN OF PROOF

The Character and Fitness Committee investigation, hearing, and other reinstatement proceedings are conducted in accordance with SCR 3.500, SCR 3.505, SCR 3.510, SCR 2.040 and SCR 2.050. An applicant for reinstatement who applied for reinstatement on or after October 1, 1998 and who appears before the Committee has the burden of proving by "clear and convincing" evidence that he/she possesses the requisite character, fitness and moral qualifications for re-admission to the practice of law (SCR 3.330).

Applicants are to be held to a substantially more rigorous standard than a first time applicant and the proof presented must be sufficient to overcome the prior adverse judgment. The judgment of disbarment continues to be evidence against the applicant and he may overcome it only by the most persuasive proof. *In re Weaks,* Ky., 407 S.W.2d 408, 409 (1966), *In re Stump,* Ky., 272 Ky. 593, 114 S.W.2d 1094 (1938) and *Keenan,* 313 Mass. 186, 47 N.E.2d 12, 32.

The Committee notes for the record that Bar Counsel has a standing objection to the introduction of evidence by affidavit. The Committee admits affidavits pursuant to SCR 2.300(4)(c) and those affidavits are reviewed and considered in preparing recommendations. The Committee feels that affidavits can be used to expedite the hearing process and that affidavits are frequently simply cumulative in nature rather than critical to issues under consideration. Therefore, the Committee admits and weighs the evidentiary value of the affidavits, rather than excluding them. In this case, the Committee notes that its recommendation would be unchanged even if it had excluded all affidavits.

In addressing the reinstatement application of Mr. Hubbard the Committee has focused on three primary issues. They are:

*ISSUE ONE—Has Mr. Hubbard shown by clear and convincing evidence that he has complied with every term of the order of suspension or disbarment?*

*ISSUE TWO—Has Mr. Hubbard presented clear and convincing evidence that he possesses sufficient professional capabilities to serve the public as a lawyer?*

*ISSUE THREE—Has Mr. Hubbard shown by clear and convincing evidence that he is of good and moral character?*

## IV. FINDING OF FACT

Based on the evidence of record and the testimony heard, the Character and Fitness Committee makes the following findings of fact:

ISSUE ONE—*Has Mr. Hubbard shown by clear and convincing evidence that he has complied with every term of the order of suspension or disbarment?*

The Order of Disbarment entered June 23, 1994 stated that the terms of disbarment were that Mr. Hubbard:

1. Shall not engage in the practice of law until such time as the Supreme

Court enters an order reinstating his membership.

2. Shall not apply for reinstatement for a period of five years from June 23, 1994.
3. Shall seek reinstatement under SCR 3.520 or successor to that rule.
4. Shall pay costs of any disciplinary proceedings.
5. Shall be ineligible for reinstatement if there are unsatisfied claims due and owing to the Clients' Security Fund.
6. Shall give notice to all clients or provide the KBA Director with a certification that there are no such clients.

The Committee finds that Mr. Hubbard has not sought reinstatement for more than five years after the order of disbarment. The Committee also finds that by document dated January 28, 2000 Mr. Hubbard states that he is in full compliance with the Order of Disbarment (Committee Exhibit 6—Page 10). This fact was reaffirmed by testimony. The Committee will assume, based on Mr. Hubbard's statements and in the absence of objection by Bar Counsel, that all terms have been complied with. Therefore, based on the evidence of record the Committee finds that Mr. Hubbard has complied with the Supreme Court's Order of Disbarment.

The Committee notes that near the end of Committee Exhibit 7 there is a certification by the Director for CLE which seems to show that Mr. Hubbard is currently CLE compliant. However, this is an issue for final confirmation by the Board of Governors.

## COMMITTEE FINDING RELATING TO ISSUE ONE

Based on the findings of fact outlined above the Committee finds that Mr. Hub-

bard meets this threshold requirement for reinstatement, subject to Bar Counsel's verification of compliance with the continuing legal education requirements (SCR 3.500(1)) and subject to meeting the testing requirements set forth in SCR 3.510(4).

ISSUE TWO—*Has Mr. Hubbard presented clear and convincing evidence that he possesses sufficient professional capabilities to serve the public as a lawyer?*

In support of his application, Mr. Hubbard presented the following evidence:

## STATEMENTS BY CARROLL HUBBARD

1. He believes he has "sufficient professional capabilities to serve the public as an attorney."
2. He is familiar with areas of domestic relations, title work, personal injury and workmen's compensation. That he would study the fields diligently and not make any mistakes.

## STATEMENTS BY KYLE HUBBARD

1. Mr. Hubbard is "devoted to going back and helping people as an attorney".
2. He will be a credit to the profession.

## STATEMENTS BY DENNIS NULL

1. He observed Mr. Hubbard for three years as an attorney.
2. "He was meticulous almost to a fault."
3. "He had great follow-up as far as clients were concerned."

## STATEMENTS BY JAMES W. OWENS

1. If Mr. Hubbard was readmitted his firm would hire him.
2. They have plenty of work for him presently.

The Committee has some concern about Mr. Hubbard's inattention to detail in completing his Application for Reinstatement or Restoration, his Application for Admission to the Kentucky Bar, and his tax returns. The Committee has weighed those concerns against the statements by Mr. Null about how meticulous Mr. Hubbard was as a practicing attorney, against Mr. Hubbard's apparent recognition of the areas of the law where he is more knowledgeable, and against Mr. Owens' offer to permit Mr. Hubbard to re-enter the profession by working for his firm where there would be the support necessary for him to safely bring his skills up to speed. On balance the Committee finds the evidence to be clear and convincing that if Mr. Hubbard were readmitted to the Bar he would be capable of serving the public as a lawyer.

COMMITTEE FINDING RELATING TO ISSUE TWO

The Character and Fitness Committee finds that based on evidence before the Committee and the oral testimony Mr. Hubbard has presented clear and convincing evidence that he has the professional capabilities to serve the public as a lawyer and has overcome the negative presumption created by the prior determination that he engaged in professional misconduct. *In re Weaks, supra,* and *In re Stump, supra.*

ISSUE THREE—*Has Mr. Hubbard shown by clear and convincing evidence that he is of good and moral character?*

In determining whether Mr. Hubbard has met his burden of proof on this issue the Committee has considered a number of factors. Those include the following:

1. Has Mr. Hubbard manifested a sense of wrongdoing, realized the seriousness of his prior misconduct, and expressed regret for that conduct?

On this issue Mr. Hubbard testified that:

a. He does appreciate that his conduct was wrong.

b. He went through a lot because of his mistakes.

c. What he did was a crime.

d. What he did was devastating to his life and family.

Other testimony on this issue:

John C. Huffman

a. While in prison Mr. Hubbard was very penitent and humble about what he had done.

b. He did not feign innocence.

c. He "... is contrite and it takes a good bit of humility to acknowledge that."

David L. Van Horn

a. He is remorseful, regretted what has occurred and was contrite, and he's very sincere in that.

b. Events that occurred were out of character for Carroll Hubbard.

Kyle T. Hubbard

a. He recognizes the seriousness of what happened and he has accepted his guilt.

b. He knows that Mr. Hubbard is contrite. "Sometimes......he's been overly contrite because he, he speaks to groups, encourages people who've made mistakes to pick themselves up and go forward.

Daniel Street

a. In letters from prison he would hit on points of contrition and remorse.

b. In a recent talk at the Calvary Baptist Church he indicated his sorrow for the wrongfulness of his acts.

Timothy A. Cantrell

a. He has said more than once how sorry he was that he got involved.

b. He is remorseful about what he has done.

Vivian Hubbard

a. "Well, he certainly is sorry for what he did, and is contrite. He's certainly humble....."

b. He admits he did wrong.

c. He is very careful about following the law and not breaking the law in any way.

Dennis L. Null, based on long friendship and association, believes Mr. Hubbard has accepted responsibility for what he did.

The Committee finds that based on the testimony outlined above Mr. Hubbard has shown an appreciation of his mistakes and failure to maintain the high standards demanded by the legal profession. *In re Cohen*, Ky., 706 S.W.2d 832, 834 (1986) and *In re Applewhite*, Ky., 401 S.W.2d 757, 758 (1965). In addition, Mr. Hubbard has expressed an appreciation for the fact that his disbarment has not only had an impact on his own life and that of his family but in a broader context expressed a sincere concern about the impact of his actions on others, including the legal profession. Therefore, the Committee finds that Mr. Hubbard's expressions of regret meet the standard set forth in *Skaggs v. Kentucky Bar Association*, Ky., 954 S.W.2d 311, 314 (1997) and to be clear and convincing evidence that he meets this essential element for reinstatement.

2. Has Mr. Hubbard so rehabilitated himself that he is again worthy of public trust and confidence? On this issue the Committee has looked at the following factors:

a. Has Mr. Hubbard's conduct since his suspension been exemplary?

In support of his application, Mr. Hubbard made the following statements regarding changes to his life and professional activities that would support public confidence and trust:

i. He was hired by J.T. Carneal Enterprises, Inc., in January 1998 and is still working there.

ii. He had his civil rights restored October 6, 2000.

iii. He could take bankruptcy but doesn't want to do so, in spite of very heavy debt load.

iv. He will agree to pay 10% of his after tax income to retire his debts if readmitted and if not readmitted he plans to pay 5% toward that end.

v. He spends hardly anything on himself.

Other statements in support of Mr. Hubbard's application on this issue:

John C. Huffman

i. He feels that Mr. Hubbard has learned from his mistakes and he may be stronger and better for it.

ii. "Carroll enjoys the affection of the majority of the people in that area, and that, despite this, they have respect for him."

David L. Van Horn—The occurrences were out of character.

Kyle T. Hubbard

i. He never increased his indebtedness while in prison.

ii. It was the circumstances of raising two children and a second wife, who had three daughters which caused him to live above his means, but it was not what he wanted to do.

Daniel Street—The events that occurred were not what he had seen

from Mr. Hubbard his whole life and not his normal way of doing business.

Vivian Hubbard

i. They go to church.

ii. Mr. Hubbard is in the Lion's Club. This statement is supported by Dora Clark who stated that Mr. Hubbard was very active in the club's service groups.

Dennis L. Null said that "... if he goes out and he talks to churches as he has and tells them about the fall from grace that he has had, and how.....he's built his life back up and who he gives his credit to, then I don't see how that can do anything but help the legal profession, the image." This comment is supported by the statement of the Mayor of Paducah, Albert Jones.

There is also of record an investigative report at Committee Exhibit 9 that shows no evidence of Mr. Hubbard having violated any rules or regulations since his initial incarceration. There are numerous letters and affidavits in Committee Exhibits 9, 10 and other documents in file which support a finding that there have been changes to Mr. Hubbard's life and professional activities that would support public confidence and trust.

Based on this evidence the Committee finds that Mr. Hubbard's conduct since disbarment has been of a positive proactive nature and to be of the type of exemplary behavior required. *In re Nisbet,* Ky., 296 S.W.2d 465 (1956). Therefore the Committee finds that Mr. Hubbard has shown by clear and convincing evidence that his conduct since his suspension has been and is worthy of public trust and confidence and supports his application for reinstatement. *In re Skaggs, supra.*

b. Has there been a sufficient testing period?

The period of disbarment imposed on Mr. Hubbard was five years from June 23, 1994. A period of nearly seven (7) years have elapsed since that disbarment. While the Committee recognizes that much of that period was spent in incarceration or on parole the Committee notes that his home confinement ended July 20, 1997 and finds that the period since disbarment and the period that he has been able to interact with the local community to be a sufficient testing period for a proper character determination. *In re Stump, supra.*

c. Has Mr. Hubbard been completely candid with the Committee?

On this issue the Committee has looked at the testimony of Mr. Hubbard to determine whether he has shown the requisite candor with the Committee, since reinstatement is not warranted where an applicant has not been completely candid with the reviewing authority at all times. *In re Cohen,* Ky., 706 S.W.2d 832, 834 (1986).

The Committee finds that Mr. Hubbard was candid in making several important admissions. For instance:

i. He admits that what he did was a crime and was wrong.

ii. That he devised the scheme.

iii. That his wife's election would have been a step toward him becoming governor.

iv. That his acts were foolish.

v. That his judgment was clouded by arrogance and pride.

vi. That he has gone through a lot because of his trying and his mistakes.

vii. That his acts were devastating to his life and his family.

The Committee recognizes how difficult these admissions are and found the answers given by Mr. Hubbard to be responsive, open and honest. The Committee feels that there is no better test of whether an applicant is being candid with the Committee than when he makes statements regarding his admission of wrongdoing and Mr. Hubbard was extremely forthcoming and therefore, in spite of minor inconsistencies in his application, the Committee found his testimony to be clear and convincing evidence of Mr. Hubbard's candor with the Committee.

d. Has Mr. Hubbard followed rules and regulations since his suspension?

During its investigation, the Committee identified only one instance when Mr. Hubbard appeared guilty of a violation of a rule or regulation. That was his failure to pay his quarterly federal taxes for 1999. The Committee spent a considerable amount of time exploring why this occurred. It appears that it occurred as a result of the severe financial situation that Mr. Hubbard finds himself in and he is now addressing that tax issue, having decreased the amount owed from about $5,700 to about $2,200. While the Committee is concerned not only about this IRS issue but also about Mr. Hubbard's total debt situation the Committee does not find the failure to timely pay quarterly federal taxes for 1999 to be a sufficient basis on which to deny Mr. Hubbard's application. *In re Skaggs, supra.* Therefore, in the absence of other evidence to the contrary, the Committee finds the evidence of record to be clear and convincing proof of Mr. Hubbard's adherence to public and professional rules and regulations since his suspension.

e. Has Mr. Hubbard evidenced fiscal responsibility since his disbarment?

The Committee finds that Mr. Hubbard's current debt status to be staggering and is as follows:

| | | |
|---|---|---|
| i. | Restitution to Federal Govt. | $115,000 |
| ii. | Cost of incarceration | $ 42,760 |
| iii. | Legal Fees | $131,853 |
| iv. | Eighteen Banks | $120,000 |
| v. | 1999 Taxes | $ 2,200 |

The Committee is very concerned about Mr. Hubbard's current financial situation and is fully aware of the frequency with which members of the bar improperly use client funds when pressured by large personal debts. However, the Committee recognizes Mr. Hubbard's efforts in reaffirming his past obligations, in setting forth a formal payment plan and his commitment to avoiding filing for bankruptcy as an easy way out. Mr. Hubbard's statements and extraordinary efforts have convinced the Committee that he has a sincere interest in trying to meet his past debt obligations. In addition, it is apparent to the Committee that many of the pressures that initially led to his present fiscal situation no longer exist and it's likely that, with discipline and effort, he can eventually extract himself from his present fiscal situation.

Therefore, the Committee finds the evidence of record to be clear and convincing proof of Mr. Hubbard's fiscal responsibility since his disbarment.

f. The final question addressed by the Committee is whether Mr. Hubbard's readmission would have an adverse impact on the honor and integrity of the legal profession and whether he would be a credit and not a detriment to the profession of law.

On this issue the Committee found a number of statements in the record that appear to be directly relevant. They include the following:

i. James W. Owens stated that Mr. Hubbard's return to the community has been well received and he has been forgiven by the community.

ii. John C. Huffman stated that Mr. Hubbard enjoys the affection of the majority of the people in the area and despite his disbarment they have respect for him. However on the issue of reinstatement there would be some who probably would not like it but many who would be pleased.

iii. Kyle T. Hubbard stated that he thinks that when Carroll Hubbard is reinstated a lot of people in Western Kentucky will agree that he's been punished enough, and at age 63 he deserves to go back to the profession that he chose when he went to law school.

iv. Timothy A. Cantrell stated that Mr. Hubbard has been punished but he has changed and "...it is a true change based on what he has communicated.....and I do think he ought to be given another chance in life."

v. Dennis L. Null stated that in his opinion Mr. Hubbard's readmission to the practice of law would help the image of the Bar in Western Kentucky. There has been publicity about his efforts and there have been no negative comments on his application. In addition he stated that if he treats clients as he previously did, if he has the guidance of a lawyer in a good law firm, and if he continues to go out and talk to churches about the fall from grace that he had and how he's built his life back up and who he gives credit to then Mr. Null felt it could do nothing but help the image of the legal profession.

There are many other letters, statements and affidavits in the file in support of Mr. Hubbard's application.

The Committee *is* very troubled by the question of whether Mr. Hubbard's readmission would have an adverse impact on the honor and integrity of the legal profession and whether he would be a credit and not a detriment to the profession of law. In addition, we must remember that reinstatement is not a matter of grace or pardon for past offenses and that the Committee's duty is to protect the interest of the public and the profession, as well as those of the applicant. *In re Stump, supra,* and *In re Weaks, supra.*

A disbarred attorney's application is not to be treated as an original application but rather many factors such as the nature of the misconduct for which he was disbarred must be carefully considered. *In re Stump, supra.* While sympathetic considerations are factors for consideration the reinstatement of a disbarred attorney should in no way lower professional standards. *In re Weaks, supra.*

When the issue before the Committee is the readmission of an elected public official ·who breached the public trust the Committee feels the standard for readmission must be higher than for most other readmissions. By the very nature of the applicant's status when the misconduct occurred, those reinstatements will receive the highest level of public scrutiny and carry the greatest likelihood of tarnishing the honor and integrity of the legal profession if the readmission is granted.

The Committee has two primary concerns in this case. One is the fact that Mr. Hubbard applied for reinstatement before even his parole was ended. Approval of an application filed at such an early date could give the impression that Mr. Hubbard was admitted simply because his time had run. A second con-

cern is the fact that Mr. Hubbard has such a large debt structure and the fact that it could represent a pressure for the future misuse of client funds. However the Committee finds two very positive considerations. One is the very positive way that Mr. Hubbard has addressed his debts, e.g., the plan that he has advanced for repayment of those debts. The second factor is Mr. Hubbard's early and open recognition of his misconduct and the way he has been active in his community, and around the state, in using his personal fall from grace as an example of what can happen without steadfast values.

When these factors are weighed against each other the Committee finds that there is clear and convincing evidence that changes in Mr. Hubbard's personal situation, his attitude, and the degree of support that he has demonstrated exists for his readmission justify a finding that he has again become worthy of the trust and confidence of the public and his readmission would not be a detriment to the legal profession.

## COMMITTEE FINDING RELATING TO ISSUE THREE

The Committee finds that Mr. Hubbard has shown by clear and convincing evidence that he is currently of good and moral character and that his readmission would not be a detriment to the legal profession.

## V. RECOMMENDATION OF CHARACTER AND FITNESS COMMITTEE

For the reasons set forth above the Character and Fitness Committee recommends that Carroll Hubbard, Jr.'s application for reinstatement to the practice of law be approved.

(Ms. CALDWELL, Judge PAYNE, and Mr. WOOD all concur.)

Signed this the second day of January 2001.

Respectfully submitted,

/s/

———————

Grant M. Helman, Chairman
Character and Fitness Committee

The matter was then referred to the Board of Governors of the Kentucky Bar Association ("Board"). The Board accepted briefs from the parties, heard arguments on the case and reviewed the record before taking a vote on Hubbard's application for reinstatement.

Bar counsel presented no proof at the hearing before the Character and Fitness Committee. Bar counsel did cross-examine Hubbard for 44 pages. At the proceedings and arguments before the Board of Governors, bar counsel presented no proof. However, respective counsel, as well as the Character and Fitness Committee and the Board of Governors have drawn diametrically opposite conclusions from the same testimony.

The Board of Governors rejected the Committee's recommendation and voted sixteen (16) to zero (0) to deny Hubbard reinstatement. The Board concluded, "Contrary to the conclusions of the Character and Fitness Committee, there is not requisite 'clear and convincing evidence' that Hubbard has shown the requisite character, fitness and moral qualifications for readmission pursuant to SCR 3.330." Therefore, the Board recommends to this Court that the application for Hubbard's reinstatement· be denied. The Board failed to give a reasoned and rational explanation for its rejection of the recommendation of the Character and Fitness Committee.

█ The Kentucky Board of Bar Examiners is charged by this Court to regulate Kentucky bar admissions, including a determination of the "character and fitness" of each applicant. Supreme Court Rule 2.040 created the Committee on Character and Fitness. The committee is composed of attorneys and/or judges appointed by this Court. Court rules require the Kentucky Board of Bar Examiners and its committees to act on our behalf in administering procedures for admission to the Kentucky bar and in determining the character and fitness of applicants as a condition precedent to admissions.

In delegating constitutional authority to regulate the "character and fitness" of the bar applicants and applicants for readmission, this Court has provided broad parameters as to how the committee was to establish such fitness. Supreme Court Rule 2.012 defines "fitness" as "assessment of mental and emotional health as it effects the competence of a prospective lawyer." The rules clarify that this Court is interested in "present fitness."

█ The Kentucky Bar Association "does not exist for the private benefit of the legal community." *Ex Parte Auditor of Public Accounts*, Ky., 609 S.W.2d 682, 684 (1980). In order to carry out its mission, the bar association must "maintain a proper discipline of the bar, ... initiate and supervise appropriate means to ensure a high standard of professional competence, and ... bears substantial responsibility of promoting the efficiency and improvement of the judicial system itself." *Id.* Since the power of this Court to regulate admissions to the Kentucky bar stems directly from the Kentucky Constitution, and exists to benefit the public interest, the Board of Bar Examiners and the Committee on Character and Fitness constitute an arm of this Court. Ky. Const. § 116.

█ The burden of establishing good moral character rests upon the applicant for readmission to the bar. Hubbard made a prima facie showing of good moral character by affidavits and testimony from attorneys, judges, and former employers. This is the only proof in the record and it attests to his rehabilitation and moral fitness to practice law. Once Hubbard presented sufficient proof to establish a prima facie case of good moral character, bar counsel had an implicit duty to rebut that showing with evidence of a lack of good moral character if any such evidence could be found. Bar counsel did not present any such evidence.

This Court has delegated to the Committee on Character and Fitness the responsibility of determining good moral character. The Committee received an extensive background investigation of Hubbard's activities since his disbarment, conducted a hearing, received evidence, and made findings, conclusions, and a recommendation. Because of our charge to the Committee and because of the absence of the Board of Governor's presenting any proof to rebut the recommendation of the Committee, we accept the conclusion of the Committee on Character and Fitness that Hubbard is entitled to reinstatement at this time.

Accordingly, the application of Carroll Hubbard to be reinstated to the practice of law is granted. Movant shall pay the costs incurred by the Kentucky Bar Association in the amount of $1,071.10.

LAMBERT, C.J., COOPER, GRAVES, JOHNSTONE, KELLER and STUMBO, J.J., concur.

WINTERSHEIMER, J., concurs in result only because despite the weakness of some parts of the Character and Fitness report contained herein, the vote of the

Board of Governors does not provide any reason for their unanimous vote to the contrary.